The opinion of the court was delivered by
Fennbr, J.
The plaintiffs, who are brokers, sue the defendant for $8181.91 as his share of a loss on 6200 bales of future cotton, which they allege were purchased by them for the joint account of Adolph Meyer, Carpenter & Dicks, Kaufman & Runge and T. L. Airey. They aver that the order was given to them by J. N. Carpenter, who informed them that he was authorized by said partners to give the. same; and they further allege that he was thereunto duly authorized by the defendant, Meyer. All the parties admit Carpenter’s authority to bind them except Meyer, who denies that he ever' authorized such purchase for his account.
Of course plaintiffs carry the burden of clearly proving that Meyer authorized or ratified the purchase; and without full and satisfactory proof on this subject they can not recover.
We have weighed the evidence with care and with due consideration for the high character of the witnesses, all of whom must be treated as intending to tell the truth, in absence of irreconcilable inconsistency between their statements.
We find the following to be the pertinent facts:
1. It must be taken as established by the clear preponderance of' the testimony that it ivas agreed between Airey, Fraussen (representing Kaufman & Runge) and Meyer that they would go into a pool to buy 10,000 bales of future cotton, each of them taking 2500 bales, provided Carpenter would go in with them, taking the other 2500 bales. Meyer denies that he entered into such agreement; but the affirmative testimony of Airey and Fraussen must overbear his. negation, which may well result from a deficiency of recollection, the more natural as his ignorance of further proceedings in the. *1037 transaction removed all motive for impressing the conversation on his memory.
2. Carpenter was not present when this agreement was made; but Airey saw him shortly afterward out of the presence of Meyer, and told him of the agreement between himself, Eraussen and Meyer, and asked Mm to go in with them. Carpenter consented, and, with Airey’s approval, immediately gave the order to Peet & Oo. to buy the futures for the account of the four parties, naming them.
3. Peet & Co. filled the order to the extent of 6200 bales, entering the transaction in the name of J. D. Carpenter & Co. as head of the pool (as such combinations are termed), but with a memorandum of the parties composing the pool, in which, however, the name of Victor Meyer was erroneously entered instead of that of Adolph Meyer.
4. The rules of the Cotton Exchange require that notice in writing shall be given by the broker making such transactions to the party for whom he acts, during the day on which the purchase or sale is made. Peet & Co. gave this notice to Carpenter only as head of the pool. The evidence is conflicting as to whether, under the custom of the Exchange, such notice is sufficient, or whether notice is required to be given.to each member of the pool when their names have been given.
5. We are bound to find, as a proven fact in the case, that Meyer was never notified that Carpenter had consented to go into the proposed pool, and never knew that any purchase had been made in execution of the same until a month afterward, when the transaction had been closed out at the enormous loss herein claimed. As this is the vital and pivotal point in the case, we have examined the testimony on the subject with great care. Airey, Fraussen and Carpenter knew of all the proceedings, and they seem to take it for granted that Meyer also was duly informed. But Meyer positively denies that he knew anything about them; and there is literally nothing to contradict him. He was not present when Carpenter was consulted and consented to go into the pool. He was not present when Carpenter gave the order. Peet & Co. never gave any notice to Meyer personally, but only to Carpenter; and Carpenter does not pretend to have communicated the same to Meyer.
Peet, his partner, Ellis, Airey, Fraussen and Carpenter have testified, and not one of them states that he ever, directly or indirectly, *1038 communicated to Meyer personally the facts that the pool had been compléted and the purchase made. No other persons were interested in the matter or personally knew anything about it; and if Meyer was not present when these transactions took place, and was not notified thereof by any of these parties, how else should he have received the information, and what warrant have we for disregarding his positive statement that he knew nothing of them? Much stress is laid on certain statements furnished by Peet & Co. about the time of closing out the transaction, as going to establish defendant’s knowledge, or, at least, his ratification of it, and we have considered them very carefully. The first of these is a letter, dated July 12, from plaintiffs addressed to Victor Meyer, Esq., stating: “We have made transfer to your account of the following contracts: Your one-fourth interest in account Carpenter & Co.,” etc. This letter was received at the office of V. & A. Meyer & Co., and was opened by defendant. How can such a notice be construed as informing Adolph Meyer that he was held as having an interest in such a contract? He knew that his brother had been on the high seas at the date mentioned, and contented himself with directing an examination to see whether there was any record in the house of such a transaction, and, on finding none, he telegraphed to his brother in Europe, and received a reply denying that he had made such a deal. On July 15 he wrote to Peet & Co., informing them of these facts, and of the mistake they had made. On July 13 another letter was received from Peet & Oo. addressed to the firm of V. & A. Meyer & Oo., saying: “The difference between our contracts with your New York house and those held for our senior there, and cotton for your account with us, shows debit against you for $8500, for which please send us your cheek.” This letter obviously refers on its face only to firm transactions, and was a call for margins.. Defendant promptly sent, the check called for. It turns out that this margin was made up almost entirely of the loss then shown on the Carpenter & Co. transaction, and the payment is strenuously urged as conclusive proof of defendant’s knowledge of that transaction and of his admission of liability therefor. But defendant explains that he was not posted as to the transactions between his New York house and plaintiffs; that he had perfect confidence in plaintiffs; that he knew that calls for margins required prompt action, and therefore he sent the check at once.
*1039 On the 14th of July, Peet & Oo. failed. . On the 15th the letter was written advising that Victor Meyer repudiated the transaction attributed to him.
This was followed by a claim, first, against the firm of V. & A. Meyer & Oo., and, finally, against the defendant personally, which is here in suit.
The explanations by defendant of his action are natural and reasonable, and must be accepted as honest. This action might operate as a make-weight in a case of conflicting evidence: but in face of defendant’s positive testimony that he had no notice and was absolutely ignorant of these transactions, and in absence of contradiction on this point by any witness, it is impossible for us to attribute to his conduct the construction contended for by plaintiff.
We are therefore bound to find as a fact in the case that Meyer had no notice of the completion of the pool by Carpenter’s consent, or of the purchase made in his name, until after a month had expired and the transaction had been closed out at the enormous loss claimed.
Under these facts, can Meyer be held? After reading and rereading the testimony of Messrs. Airey and Fraussen, the utmost scope that can be given to the agreement between them and Meyer is an agreement between themselves to enter into an agreement with Carpenter to buy 10,000 bales of futures on the joint account of all four, provided Carpenter would consent. In other words, Meyer authorized Airey and Fraussen to propose to Carpenter the formation of such a contract. Airey and Fraussen were not bound to make the proposition. Either of them might have abandoned the scheme the moment they parted from Meyer. The only authority given to them by Meyer was to propose such an agreement to Carpenter. When Carpenter consented, Meyer was entitled to notice thereof before any further proceedings were taken. Article 1800, O. 0., provides: “The contract consisting of 'the proposition and the consent to it, the agreement is incomplete until the acceptance of the person to whom it is proposed. If he who proposes should before that consent is given change his intention on the subject, the concurrence of the two wills is wanting, and there is no contract.” Article 1801 says: “ The party proposing shall be presumed to continue in the intention which his proposal expressed if, on receiving *1040 the unqualified consent of him to whom the proposition is made, he do not signify the change of his intention.”
From these articles it follows that Meyer had the right to recede from his proposition, even after acceptance if, on receiving notice of acceptance, he promptly asserted the right. But, conceding that the authority given to Airey and Fraussen authorized them to bind Meyer finally by the agreement with Carpenter, what was the nature of that agreement? Simply an agreement to buy together 10,000 bales of futures. It is evident that such an agreement could have no executory force by reason of the entire uncertainty in the object of the contract.
Anything more indefinite and incomplete than an agreement to buy 10,000 bales of futures could hardly be conceived. It does not settle the months for which the purchases are to be made, nor fix or limit the prices to be paid, nor designate the party in whose name the order is to be given, and who is to exercise the very important function of receiving notices, nor the broker to whom the order was to be given. In this case Carpenter exercised the very important power of stopping the purchases at 6200 bales.
Whence did Airy, Fraussen and Carpenter derive the right to settle all these matters by themselves without consulting or even notifying Meyer?
Moreover, under the rules of the Exchange, Meyer was undoubtedly entitled to notice of the purchase made for his account. This right is of inestimable importance. Admitting that, in cases of pools, notice to that member of the pool who gives the order is sufficient, this rests only the assumption that he has been authorized by the other members to act for them in giving the order and to receive such notices. But whence did Carpenter derive the right to act for Meyer in these important matters ? Meyer never authorized him to act as his agent in this transaction; never knew that he had acted as such; never knew that he had acted at all. Notice to Carpenter, not communicated to Meyer, was no notice to Meyer. The broker, who gives notice to the head of a pool, simply acts on the assumption that he is authorized to receive notice for his associates, and takes the risk of the correctness of that assumption. When it is shown, as in this case, that he was not so authorized by a party sought to be bound by such notice, such party can not be held in law, or under any custom.
*1041 If there is any class of dealings in which clear and unequivocal knowledge is essential to the parties engaged, it is certainly dealing in futures, in which ignorance deprives a party of the opportunity of self-protection and exposes him to ruinous losses. The estimable gentlemen who undertook to engage Meyer in this transaction have taken too much for granted, and have dealt rashly and without the exactitude required in such operations. Upon whomsoever the loss may fall, it can not be cast on Meyer under the evidence in this record; and we are bound to approve the ruling of the judge a quo.
Judgment affirmed.